In the Matter of STAUFFER CHEMI-CAL COMPANY, Plaintiff-Appellee,

v.

ENVIRONMENTAL PROTECTION AGENCY and United States of America, Defendants-Appellants.

No. 80–1879.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 27, 1981.

Decided May 8, 1981.

Rehearing Denied June 16, 1981.

Charles F. Lettow, Washington, D. C. (and Eric C. Jeffrey, Washington, D. C., and Blair J. Trautwein, Cheyenne, Wyo., of counsel; Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., and Hathaway, Speight & Kunz, Cheyenne, Wyo., with him on brief), for plaintiff-appellee.

Peter Beeson, Washington, D. C. (Dirk Snel, Atty., Dept. of Justice, and James W. Moorman, Asst. Atty. Gen., Washington, D. C., and Charles E. Graves, U. S. Atty., Cheyenne, Wyo., of counsel; Christopher Herman, Atty., E. P. A., Washington, D. C., with him, on brief), for defendants-appellants.

Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.

McWILLIAMS, Circuit Judge.

The principal issue here to be resolved is whether, under Section 114(a)(2) of the Clean Air Act, an employee of a private company under contract with the Environmental Protection Agency (EPA) is an "authorized representative" of the EPA Administrator for the purpose of entering and inspecting the premises of an emission source. 42 U.S.C. § 7414(a)(2) (Supp. II 1978 and Supp. III 1979). The District Court held that an employee of such independent contractor is not an "authorized representative" of the Administrator, and EPA appeals.

Stauffer Chemical Company is a chemical manufacturer whose facilities include a phosphate ore processing plant located in

Lincoln County, near Sage, Wyoming, which will hereinafter be referred to as the Leefe Plant. Pursuant to the Clean Air Act,[1] EPA has developed an oversight inspection program which is designed to evaluate the effectiveness of the individual states' inspection and regulatory procedures as well as to assess the compliance status of the country's major sources of air pollution. Under this program, state pollution control agencies are responsible for conducting annual inspections at each of the major sources in the state. EPA's regional offices are responsible for conducting annual oversight inspections at ten percent of the major sources within each state.

Region VIII of the EPA has responsibility for a six-state area encompassing Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming. There are about 1,000 major stationary sources of air pollution in these six states, of which 230 are located in Wyoming. The decision as to which sources will be inspected is based on a neutral administrative scheme that focuses on classes of industry, their geographic location, and the frequency of past inspections. As indicated, to implement its role in the oversight inspection program, Region VIII selected ten percent of its major sources of air pollution for inspection in 1980. Stauffer's Leefe Plant was one of the sources selected for inspection by EPA under the described administrative scheme.

At 10:00 a. m. on April 10, 1980, a team of EPA inspectors arrived unannounced at Stauffer's Leefe Plant. The inspection team consisted of Dr. Charles O'Boyle, an EPA environmental engineer, Lee Gribb, an official of Wyoming's Division of Air Quality, and two employees of GCA Corporation,

a North Carolina corporation under contract to EPA to aid in carrying out oversight inspections. It was intended that the GCA employees would make the actual inspection, with supervision from Dr. O'Boyle, who was to be present at all times. Without going into any great detail, Stauffer's employees, upon direction of their supervisors, refused to admit the team of inspectors. Stauffer's employees told the inspection team that it would admit EPA and state officials, but would not admit the two GCA employees unless the latter signed a nondisclosure and hold harmless agreement. The EPA team did not agree to the conditions which Stauffer had imposed, and left the plant premises without making an inspection.

Negotiations then ensued between Stauffer and EPA in an effort to resolve the matter. Although it did impose some additional conditions,[2] Stauffer's basic position was that the two GCA employees would have to sign nondisclosure and hold harmless agreements before being admitted to the plant. Stauffer claimed that it was simply trying to protect its trade secrets.[3]

When the negotiations between Stauffer and EPA came to a standstill, EPA sought an administrative search warrant. On May 8, 1980, the United States Attorney for the District of Wyoming applied to a United States Magistrate in Cheyenne, Wyoming for an administrative search warrant authorizing EPA to conduct an inspection of the Leefe Plant through the use of the two GCA employees. Supporting affidavits set forth the purpose of the inspection, the need for a warrant, and the neutral administrative scheme underlying the selection of

1. 42 U.S.C. §§ 7401–7642 (Supp. II 1978 and Supp. III 1979).

2. The additional conditions imposed included: (1) Stauffer shall be permitted prior to, or at the time of the Plant visit, to advise the contractors generally of the areas and processes which Stauffer deems to be confidential and proprietary; and (2) Stauffer reserves the right to exclude from the Plant visit any Plant areas except emission sources and to refuse to disclose any information which Stauffer in its sole judgment deems inappropriate.

3. We note that the District Court entered a finding of fact in this regard which stated: "Many of the processes used at the Leefe Plant are highly proprietary and involve the application of trade secrets or confidential 'know-how' and information developed by Stauffer during its years of operation." The District Court went on to find that some of these trade secrets, including Stauffer's method for providing fuel for use in calcining phosphate ore, "could be noted by an inspector merely by visual observation of equipment in the facility."

the Stauffer facility.[4] In addition, the application specifically provided that though the GCA employees would make the actual inspection, they would be accompanied by EPA employees.

Based on the showing thus made, the Magistrate issued a warrant for the inspection of Stauffer's Leefe Plant. The warrant authorized "any duly designated enforcement officers and employees of the Environmental Protection Agency, and authorized employees of EPA's contractor, GCA Corporation, who have been duly authorized to conduct inspections as EPA representatives," to enter Stauffer's Leefe Plant during normal operating hours for the purpose of conducting a compliance evaluation oversight inspection pursuant to Section 114 of the Clean Air Act, 42 U.S.C. § 7414.

On the morning of May 13, 1980, the inspection team, which still included two GCA employees, attempted to execute the warrant and inspect the Leefe Plant. The inspection team again appeared unannounced. Stauffer, again, refused to admit the inspection team unless the GCA employees signed a nondisclosure and hold harmless agreement. EPA and the GCA employees refused to agree to Stauffer's conditions, and the team left the plant.

On the afternoon of May 13, 1980, Stauffer went to court. On that date Stauffer filed the following with the United States District Court for the District of Wyoming: (1) an application for a temporary restraining order enjoining EPA and the two GCA employees from executing the warrant, and (2) a motion to quash the warrant. A temporary restraining order issued the same day. Thereafter, on June 20, 1980, after an extended evidentiary hearing, the District Court permanently enjoined EPA from using GCA employees, or employees of other companies under similar contract with EPA, in inspections of any Stauffer plant in

Wyoming without the permission of Stauffer Chemical Company.[5] It is from the June 20, 1980, injunctive order that EPA appeals.

The issue as presented on appeal is a very narrow question of statutory interpretation. The starting point in every case involving the construction of a statute is the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Section 114(a)(2) of the Clean Air Act, enacted in 1970, appears as 42 U.S.C. § 7414(a)(2) and provides as follows:

(2) *the Administrator or his authorized representative*, upon presentation of his credentials—

(A) *shall have a right of entry* to, upon, or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

(B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which such person is required to sample under paragraph (1). (emphasis added).

The particular phrase in the foregoing statute with which we are concerned is: "the Administrator or his authorized representative." The question is whether, in the fact setting described above, the two employees of GCA, the North Carolina corporation under contract with EPA, are "authorized representatives" of the EPA Administrator. As indicated, the trial court held that they were not. We agree.

The term "authorized representative" is not defined in the Clean Air Act. The present statute, therefore, does not expressly state whether employees of a company

---

4. The supporting affidavits were submitted by Dr. Charles O'Boyle, the EPA environmental engineer who was in charge of the Region VIII inspection team which sought to inspect Stauffer's Leefe Plant and by Christine M. Phillips,

Branch Chief of the General Enforcement Branch of EPA Region VIII.

5. The opinion of the district court is now reported at 14 E.R.C. 1737.

under contract with the EPA may, or may not, be authorized by the Administrator to serve as his representative. Such being the case, it is up to the courts when called upon, as we now are, to define the term. The touchstone in construing statutory language is legislative intent. *Caminetti v. United States*, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). The EPA suggests that legislative intent may best be ascertained in this case by applying the "plain meaning" test[6] and that an "authorized representative" simply means "any person duly authorized to act or speak for another or others." EPA cites in support of its position Webster's New World Dictionary, 2d Coll. Edition 1974. We decline to give such a literal interpretation.

In the belief that the "plain meaning" test does not solve our problem, we turn next to legislative history. Although the relevant legislative history is not entirely clear or consistent, in our view it is nonetheless helpful. As previously stated, Section 114(a)(2) of the Clean Air Act was enacted in 1970. The legislative history of the Clean Air Act, which pertains to that Section, indicates that, upon the disagreeing votes of the two Houses, a committee of conference agreed to a substitute for both the proposed House Bill and Senate Amendment. By way of explanation, the conferees published their discussion of the House Bill, the Senate Amendment and the substitute provision agreed upon, in regard to each section. The conference report stated that in the Senate's proposed amendment, referred to as Section 116 of Senate Bill 4358, "the Senate *authorized entry and inspection by DHEW personnel* of buildings, facilities, and monitoring equipment for purposes of setting standards and enforcing them." The conference report then stated that "[t]he provisions of the conference report with regard to inspections, monitoring

and entry follow substantially the provisions of the Senate amendment." (emphasis added). H.R. (Conf.) Rep.No.91–1783, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News, 5356, 5379–81.

The foregoing would seem to indicate that under Section 116 of the Senate Bill, which later substantially became Section 114(a)(2) of the Clean Air Act, an "authorized representative" of the Administrator was restricted to "DHEW personnel." In this regard we note that the Clean Air Act was administered by the Department of Health, Education and Welfare before EPA was created. The phrase "DHEW personnel" in the legislative history, therefore, must now be read as "EPA personnel." EPA points out that the legislative history referred to above does not, in so many words, limit such authorization to "DHEW personnel." We are not impressed by this particular argument. In our view an affirmative grant of authority to a described group precludes a grant of that same authority, by implication, to a different group. In any event, counsel does not suggest that the employees of GCA are "EPA personnel." They are not, of course. They are GCA personnel.

Furthermore, there is additional legislative history which sheds light on this issue. In 1972 Congress amended the Clean Water Act,[7] to include Section 308, which now appears as 33 U.S.C. § 1318(a)(B). That particular section is virtually identical to Section 114(a)(2) of the Clean Air Act, and provides, in part, as follows:

> (B) the *Administrator or his authorized representative,* upon presentation of his credentials—
>
> (i) *shall have a right of entry* to, upon, or through any premises in which an effluent source is located or in which any records required to be maintained under clause (A) of this subsection are located, and

6. The "plain meaning" test essentially means that "statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them." *Caminetti v. United States*, 242 U.S. 470, 485–86, 37 S.Ct. 192, 194–95, 61 L.Ed. 442 (1917).

7. Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. §§ 1251–1376 (1976, Supp. I 1977, Supp. II 1978).

(ii) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under clause (A), and sample any effluents which the owner or operator of such source is required to sample under such clause. (emphasis added).

Because Section 308 of the Clean Water Act uses the identical language of Section 114(a)(2) of the Clean Air Act, *i. e.*, "the Administrator or his authorized representative," we find the legislative history of Section 308 to be relevant to our determination of the present case. The Report of the Senate Public Works Committee, which discusses Section 308 of the Clean Water Act, includes the following commentary:

It should also be noted that the authority to enter, *as under the Clean Air Act*, is reserved to the Administrator and his authorized representatives *which such representatives must be full time employees of the Environmental Protection Agency.* The authority to enter is *not* extended to contractors with the EPA in pursuit of research and development. S.Rep.No.92–414, 92d Cong., 2d Sess., *reprinted* in [1972] U.S.Code Cong. § Ad. News 3668, 3729. (emphasis added).

█ We recognize that the legislative history of Section 308 of the Clean Water Act was published in 1972, whereas Section 114(a)(2) of the Clean Air Act was enacted in 1970. Post-enactment legislative history is generally not to be accorded the same weight as legislative history occurring in connection with the enactment of the statutory language under immediate consideration.[8] There is, however, only a two-year interval between the enactment of Section 114(a)(2) of the Clean Air Act and Section 308 of the Clean Water Act, and there is of course a close subject-matter relationship

between the two acts. In light of such considerations we find the legislative history of Section 308 of the Clean Water Act to be supportive of our holdings. Further, we observe that, if the EPA's position were to be accepted, an employee of a company under contract with the EPA could *not* be an authorized representative of the Administrator for the purposes of entry and inspection under the Clean Water Act, whereas, such person could be an authorized representative of that same EPA Administrator under the Clean Air Act. Such a result, to us, seems anomalous.

█ It is on this basis that we conclude that the employees of an independent contractor, such as GCA, are not authorized representatives of the EPA Administrator for the purposes of Section 114(a)(2) of the Clean Air Act.[9] The trial court was correct in so holding and, under the circumstances, properly enjoined the use of the two GCA employees by the EPA in executing the Magistrate's administrative search warrant. Having determined that the warrant was fatally flawed because it authorized GCA employees to go onto Stauffer's Leefe Plant, we need not consider the other objections which Stauffer raised concerning the warrant.

By our resolution of this appeal, we do not wish to be understood to indicate that this is an open-and-shut matter. We recognize that the various sections of the Clean Air Act mentioning "officers and employees" of EPA, and the latter's "authorized representative," are open to the charge that they are not entirely internally consistent. Ascertainment of Congressional intent is not always an easy matter. We are persuaded, however, that the legislative history of Section 114(a)(2) of the Clean Air Act and Section 308 of the Clean Water Act

8. *See United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960).

9. We acknowledge that our conclusion is contrary to the findings of the District Court in *Bunker Hill Company v. United States Environ-*

*mental Protection Agency,* No. 80–2087 (D. Idaho, Oct. 15, 1980), *appeal docketed,* No. 80–3446 (9th Cir. 1980) and in opposition to *dicta* in the District Court's opinion in *In The Matter of Aluminum Company of America,* No. M–80–13 (M.D.N.C. July 9, 1980), *appeal docketed,* No. 80–1599 (4th Cir. 1980).

dictate our affirmance of the District Court.

Judgment affirmed.