**NATIONAL–STANDARD COMPANY, Plaintiff,**

v.

**Valdas V. ADAMKUS, et al., Defendants.**

Nos. 87 C 5165, 87 C 5392.

United States District Court, N.D. Illinois, E.D.

March 23, 1988.

Luis M. Rundio, Jr., McDermott, Will & Emery, Chicago, Ill., Mary Ellen Hogan, Robert J. Slobig, McDermott, Will & Emery, for plaintiff.

Gail C. Ginsberg, Asst. U.S. Atty., for defendants.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

In this case, we are asked to determine the scope of the United States Environmental Protection Agency's ("EPA") inspection and sampling authority under the Resource Conservation and Recovery Act ("RCRA"), *as amended by* the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), 42 U.S.C. § 6901, *et seq.*[1] Plaintiff National–Standard Company ("National–Standard") filed this action for declaratory and injunctive relief challenging the propriety of EPA's entrance onto its properties for an inspection and sampling visit. We conclude that EPA acted within the scope of its statutory authority at all times, and therefore we enter summary judgment for EPA.

### I. Statutory Framework

RCRA is a comprehensive statutory scheme designed to regulate the storage, transportation, and disposal of solid wastes in the United States. RCRA provides that every person owning or operating a facility for the treatment, storage, or disposal of hazardous wastes or hazardous constituents,[2] or planning to construct such a facili-

---

1. All of the statutory references in this opinion, except as otherwise explicitly noted, are to Title 42 of the United States Code.

2. The term 'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

   (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

   (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

'Hazardous Waste Constituent' means a constituent that caused the Administrator to list the hazardous waste in Part 261, Subpart D, of this chapter [40 C.F.R. § 261.30, *et seq.*] or a constituent listed in Table 1 of § 261.24 of this chapter [40 C.F.R. § 261.24].

ty, must obtain a permit from EPA. § 6925(a). Section 6925(c)(1) provides that a permit will issue if the hazardous waste treatment, storage, or disposal facility complies with all of the standards and requirements set forth in sections 6924 and 6925. Among the many requirements in those sections is the requirement that any release of hazardous wastes from any facility, regardless of whether the spill occurred before or after the issuance of the permit, must be cleaned up:

(u) Continuing Releases at Permitted Facilities.—Standards promulgated under this section shall require, and a permit issued after November 8, 1984, by the Administrator or a State shall require, corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit under this subchapter, regardless of the time at which waste was placed in such unit. Permits issued under section 6925 of this title shall contain schedules of compliance for such corrective action (where such corrective action cannot be completed prior to issuance of the permit) and assurances of

financial responsibility for completing such corrective action.

42 U.S.C. § 6924(u).[3]

RCRA also provides that EPA may require a person owning or operating a facility on "interim status"[4] to take corrective action in the event hazardous wastes are released into the environment:

(h) Interim status corrective action

(1) Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, including a temporary or permanent injunction.

(2) Any order issued under this subsection may include a suspension or revocation of authorization to operate under section 6925(e) of this title, shall state with reasonable specificity the nature of

---

40 C.F.R. § 260.10. In addition, Appendix VIII to Part 261 of 40 C.F.R. lists hundreds of chemical elements, compounds, and organic molecules which are hazardous constituents, as does Table 302.4 of 40 C.F.R. (list of hazardous substances for purposes of CERCLA).

**3.** Neither RCRA nor the regulations promulgated thereunder explicitly define what the term solid waste management unit ("SWMU") means. The regulations *do* define a *"hazardous waste management unit"* as follows:

'Hazardous waste management' unit is a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area. Examples of hazardous waste management units include a surface impoundment, a waste pile, a land treatment area, a landfill cell, an incinerator, a tank and its associated piping and underlying containment system and a container storage area. A container alone does not constitute a unit; the unit includes containers and the land or pad upon which they are placed.

40 C.F.R. § 260.10. From this definition, we can infer that a SWMU is a "contiguous area of

land on or in which *solid waste* is placed...." This definition of an SWMU is borne out by language accompanying EPA's promulgation of final regulations under HSWA.

The term 'solid waste management unit' includes any unit at the facility 'from which hazardous constituents might migrate, irrespective of whether the units were intended for the management of solid and/or hazardous wastes.' H.R.Rep. No. 198, 98th Cong., 1st Sess., Part 1, 60 (1983) ... EPA believes that the term 'unit' at least encompasses ... 'containers, tanks, surface impoundments, waste piles, land treatment units, landfills, incinerators, and underground injection wells.' 47 FR 32281 (July 26, 1982).

50 Fed.Reg. 28712 (July 15, 1985).

**4.** Any person who has applied for a permit on an existing facility, which facility is required to have a permit, and who has complied with section 6930(a) (requiring notification to the EPA of the location and description of hazardous wastes), shall be granted "interim status." § 6925(e)(1). A person on interim status may generate, store, and dispose of hazardous wastes as if he or she had a permit, *id.*, with some exceptions, (such as § 6925(i) and (j), irrelevant to this case.

the required corrective action or other response measure, and shall specify a time for compliance. If any person named in an order fails to comply with the order, the Administrator may assess, and such person shall be liable to the United States for, a civil penalty in an amount not to exceed $25,000 for each day or noncompliance with the order.

42 U.S.C. § 6928(h).

The case before this court challenges the scope of EPA's inspection and sampling powers under RCRA. EPA's general authority to enter, inspect, and obtain samples from RCRA regulated facilities comes from section 6927(a):

**(a) Access entry**

For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes. For the purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, such officers, employees or representatives are authorized—

    (1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

    (2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge.

The issue in this case is whether the EPA, acting pursuant to section 6927(a), lawfully entered National–Standard's facilities, inspected the premises, and took samples.

## II. Facts

National–Standard manufactures wire products at its two facilities in Niles, Michigan, known as the Lake Street facility and the City Complex facility. In the course of its manufacturing activities, National–Standard generates materials (such as hydorchloric acid, sulfuric acid, and alkaline wastes) which are within the RCRA definition of "hazardous wastes." § 6903(5). As required by law, National–Standard applied to EPA for a Part B permit under RCRA (see 40 C.F.R. Part 270) for the temporary storage of the hazardous wastes it generated. At present, the application remains pending and National–Standard is operating its waste storage facilities on "interim status." See n. 4, supra.

On April 3, 1987, EPA informed National–Standard that it was planning a sampling visit at National–Standard's facilities as the next stage of the corrective action program required under section 6924(u). EPA wanted to see if any corrective action was required at National–Standard's facilities before granting the company a permit to store hazardous wastes. EPA wanted its subcontractors (defendants Harding–Lawson Associates and K.W. Brown) and representatives of the Michigan Department of Natural Resources ("MDNR") to accompany it on the sampling visit and to actually take the samples and analyze them. EPA identified twenty areas it wanted to sample at the Lake Street facili-

ty and ten such areas at the City Complex site.

National–Standard objected to EPA's proposed sampling visit as beyond the scope of EPA's statutory sampling authority. After unsuccessful attempts to resolve their differences, National–Standard filed the present action for declaratory relief. National–Standard sought a declaration that the EPA's proposed sampling visit exceeded its statutory authority.

Three days later, and despite its knowledge of the pendency of this case, EPA applied *ex parte* to a magistrate in the United States District Court for the Western District of Michigan (the district in which National–Standard's facilities are located) for an administrative search warrant. EPA submitted the affidavit of Carol Witt, a geologist employed by EPA, in support of its warrant application. Witt's affidavit stated that she had visually inspected National–Standard's facilities and had determined that there were several SWMUs (see n. 3, *supra*) at each facility. Witt further stated that she determined from her observations of discolored soil, surface water body sediments, discontinuities in vegetation, and odors, that there had been releases of what may be hazardous wastes or constituents from some of the SWMUs. Witt stated she believed the releases may have been of hazardous wastes because they were near SWMUs containing ignitable solid wastes, copper cyanide, lead, or wastewater treatment sludges from electroplating operations. Witt proposed taking no more than sixty soil, water, and air samples, including background samples, at the facilities.

The magistrate issued the warrant as requested. The warrant authorized the EPA to enter National–Standard's plants, to inspect the premises, and to take up to sixty samples.

National–Standard immediately came into this court seeking an emergency order quashing the search warrant and temporarily restraining EPA from conducting its sampling visit. We declined to issue the temporary restraining order, finding no irreparable injury and finding the equities favored the EPA. Subsequently, however, the parties reached an agreement to maintain the status quo pending judicial resolution of their dispute. EPA's contractors were given access to National–Standard's facilities, but the results of the analysis of those samples have been withheld from EPA pending resolution of this suit.

### III. The Parties' Arguments

EPA contends that National–Standard's suit is essentially an attack on the validity of the administrative search warrant issued by the magistrate in Michigan. EPA maintains that the warrant which authorized EPA to search, inspect, and sample National–Standard's facilities was completely proper. In arguing the validity of the warrant, EPA first contends that our review of the magistrate's determination to issue the warrant is limited to the materials presented to the magistrate. According to EPA, we are not supposed to conduct an evidentiary hearing or consider extrinsic evidence unless National–Standard alleges that the warrant application contained deliberate falsehoods or recklessly disregarded the truth and unless National–Standard supports its allegations with an offer of proof. Moreover, EPA argues we should not even allow discovery when the application for the administrative warrant was based on the sworn affidavit of a government officer and that affidavit was adequate on its face to establish probable cause. EPA concludes that its warrant application, supported by the sworn affidavit of one of its environmental scientists, conclusively established probable cause for an administrative warrant. Lastly with respect to the warrant, EPA denies that the warrant was improperly issued in an *ex parte* proceeding.

Concerning the merits of National–Standard's challenge, EPA argues that section 6927(a) grants it the right to enter National–Standard's facilities, and to inspect and take samples just as authorized by the search warrant. EPA reads the statute as granting it access to any place where hazardous wastes are now or have been located in the past. EPA rejects a narrow read-

ing of section 6927(a) which would limit it to inspect and sample only SWMUs from which there has been a release of hazardous wastes. Although under section 6927(a) EPA can enter and inspect a facility only "for the purposes of ... enforcing the provisions of" RCRA, EPA contends that it was seeking to enforce sections 6924(a) and 6928(h). Finally, EPA contends that the statute implicitly grants it the authority to sample, as well as inspect, areas which *may* contain hazardous wastes and also to take background samples.

National–Standard focuses its arguments on what it claims was the improper method by which EPA obtained the search warrant and on EPA's lack of statutory authority to enter, inspect, and obtain samples from National–Standard's facilities in the manner it did. National–Standard first attacks EPA's interpretation of RCRA. National–Standard contends that section 6927(a) grants EPA authority only to enter places where hazardous wastes *are or have been stored,* not any place where hazardous wastes might possibly be or might have been stored. According to National–Standard, section 6927(a) does not authorize EPA to take background samples from areas where hazardous wastes have never been stored. National–Standard also points out that EPA is statutorily empowered to order corrective action under sections 6924(u) and 6928(h) only when there has been (a) a release (b) of hazardous wastes or constituents (c) from a SWMU. Since EPA's inspection power under section 6927(a) is limited to the purposes of enforcing the provisions of RCRA, and the only provisions EPA has invoked are the corrective action requirements in sections 6924(u) and 6928(h), National–Standard concludes that EPA may inspect and sample only SWMUs from which there have been a release of hazardous waste or constituents.

National–Standard also argues that the administrative warrant issued by the magistrate is invalid because it was obtained in a procedurally improper manner. National–Standard argues that EPA improperly obtained the warrant on an *ex parte* basis. National–Standard contends that once it filed this declaratory judgment action, EPA should have argued its position before this court and awaited judicial resolution rather than appear before another court and obtain a warrant. And National–Standard argues that EPA's warrant application failed to demonstrate probable cause for the search. National–Standard contends there was no "specific evidence" justifying the inspection and sampling visit because Witt failed to explain how she determined certain areas were SWMUs or that releases of what may be hazardous wastes had occurred. National–Standard concludes the warrant application was deficient on its face. In addition, National–Standard demands discovery and a hearing on the validity of the warrant.

## IV. Discussion

The ultimate question in this case is whether EPA is entitled to see and use the results of its sampling visit at National–Standard's facilities. The "search and seizure" has already occurred; the issue is whether we should "suppress" the evidence gathered as a result. Although this is a civil case, analogy to criminal law seems apt. In a criminal case, a law enforcement agency searches someone or some place and seizes evidence. On a motion to suppress, the question is whether the search and seizure was lawful. The goal, from the criminal defendant's point of view, is to prevent the jury from learning of the evidence obtained as a result of the search and seizure. Similarly, in the present context, National–Standard is seeking to prevent EPA from obtaining the evidence resulting from the allegedly unlawful entry onto and inspection and sampling of its property.

National–Standard does not challenge the constitutionality of section 6927. It apparently concedes that if EPA adhered to the statute and followed the proper procedures in obtaining an administrative search warrant, the ensuing search would be lawful. First we consider whether the warrant was issued in an improper manner. Then we consider whether EPA exceeded its statutory authority. For the following reasons, we conclude that the warrant was

issued in a proper manner and that EPA did not exceed its statutory authority.

## A. The Warrant

■ In general, the government may not enter onto private commercial property unless authorized by a valid search warrant. *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). *See also Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).[5] While every search warrant must be supported by probable cause, an administrative search need not be supported by probable cause in the criminal sense. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978). Probable cause in an administrative context may be based either on specific evidence of an existing violation, *id.*, or on a showing that the inspection is being conducted pursuant to a general administrative plan for the enforcement of a statute derived from neutral sources. *Id.* at 321, 98 S.Ct. at 1824–25.

Here, EPA sought to establish probable cause for the inspection of National–Standard's facilities under the "specific evidence" prong of administrative probable cause. There is no precise definition for "probable cause"; by necessity, a probable cause determination depends on the particular facts of each case. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). One thing we know, however, is that the requirements of administrative probable cause are less stringent than those governing criminal probable cause. *Weyerhaeuser Co. v. Marshall*, 592 F.2d 373, 377 (7th Cir.1979); *In re Establish-*

*ment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335, 1339 (7th Cir.), *cert. denied*, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). Case law helps us determine what quantum of facts are enough to establish probable cause and what quantum clearly fall short.[6]

In *Weyerhaeuser*, OSHA sought entrance to Weyerhaeuser's plant to conduct an administrative inspection. In its warrant application, OSHA stated it had received a written complaint from an employee of Weyerhaeuser alleging that violations of the OSHA Act existed which threatened physical harm or injury to employees at the plant. OSHA said that based on the information in the complaint, it had determined there were reasonable grounds to believe that such violations existed. The Seventh Circuit found the warrant application inadequate to support a determination of probable cause. 592 F.2d at 378. The magistrate was given no clue as to what the nature of the alleged violations might be. The court described the warrant application as "unrelieved boiler plate" which turned the magistrate into a "rubber stamp." *Id.* *See also In re Establishment Inspection of Northwest Airlines, Inc.*, 587 F.2d 12 (7th Cir.1978).

In *Burkart Randall Division of Textron, Inc. v. Marshall*, 625 F.2d 1313 (7th Cir.1980), OSHA again sought entrance to a company's plant for purposes of investigating employee complaints. This time, however, the Seventh Circuit found the warrant application sufficient to support a finding of probable cause. The warrant application informed the magistrate of the

---

5. While conceding for purposes of this case that it needed a warrant to enter National–Standard's property, EPA notes that the Supreme Court has found an exception to the warrant requirement for inspections of closely regulated businesses. *See New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (automobile junkyard industry); *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1982) (coal mining); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms sales); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor industry). Since EPA obtained a warrant in this case and we find

that warrant valid, we have no occasion to address the propriety of a warrantless entry.

6. In evaluating whether probable cause existed to support the issuance of a warrant, EPA correctly points out that we may consider only the evidence before the magistrate at the time of application for the inspection warrant. *In re Establishment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335, 1342 (7th Cir.), *cert. denied*, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). Moreover, we give great deference to the magistrate's determination of probable cause for an administrative warrant. *United States v. May*, 819 F.2d 531 (5th Cir.1987).

nature of the employee complaints—broken plumbing, poor ventilation, unsanitary eating areas, and inadequate fire escapes (*id.* at 1315 n. 1)—and stated that OSHA had determined that reasonable grounds existed to believe that violations were occurring. 625 F.2d at 1319. The court stated that despite the unsupported and unverified statements of unknown informants, the warrant application was adequate. "In the context of an administrative probable cause determination, however, the oath of the compliance officer is entitled to greater weight than plaintiff seems willing to accord it.... 'The district judge could correctly assume, therefore, that the information contained [in the sworn affidavit of the OSHA compliance officer] was true and correct.'" *Burkart,* 625 F.2d at 1319-20, *quoting Gilbert & Bennett,* 589 F.2d at 1340.

In essence, an affidavit is adequate to support a probable cause determination when "it provide[s] the magistrate with the underlying factual data giving rise to the compliance officer's belief that a violation existed." *In re Establishment Inspection of Marsan Co.,* 7 OSHC (BNA) 1557, 1559 (N.D.Ind.1979), *quoted in Burkart,* 625 F.2d at 1320. In the end, of course, the ultimate test is reasonableness: is the inspection reasonable and is it justified? *Burkart,* 625 F.2d at 1319.

■ We now apply these principles to the case before us. An examination of the warrant application reveals it was clearly sufficient to support a finding of probable cause. Accompanying the warrant application was the affidavit of Carol Witt, an EPA geologist with a master's degree in Earth Science. Witt stated, under oath, that National–Standard's facilities are places where hazardous wastes are or had been generated, stored, treated, disposed of or transported from. She further stated that on previous occasions she had personally inspected the facilities for purposes of enforcing the corrective action provisions of RCRA. During these previous inspections, she had determined there were several SWMUs at the facilities, and had determined "that there have been releases of what may be hazardous wastes or constituents from some of the SWMUs." (Witt Affid., ¶ 13.) Witt stated that she knew releases had occurred because there was discolored soil, surface water body sediments, discontinuities in vegetation, and odors. She stated that the releases might be hazardous wastes or constituents because the releases were near SWMUs containing hazardous wastewater treatment sludges, lead, copper-cyanide, and other ignitable substances.

This information clearly was sufficient to inform the magistrate of the substance of the possible violations, so that the magistrate could exercise his independent judgment as to whether a formal inspection and sampling visit was justified. In no way was the warrant application mere boilerplate, nor did the magistrate become merely a rubber stamp. There are sworn statements of an EPA officer (which we may assume are true and accurate) stating that she believed, from personal knowledge, that releases of hazardous wastes had occurred. She even stated the basis for her belief. The warrant application was much more extensive and informative than the one which passed muster in *Burkart,* and we conclude the warrant application on its face was sufficient to support a finding of probable cause.

■ The next issue is whether National–Standard may pursue discovery and obtain a hearing to challenge the factual assertions in the warrant application. We conclude it may not. In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a criminal defendant may challenge the truthfulness of factual statements made in an affidavit supporting a search warrant, but only after the defendant had made allegations of deliberate falsehood or of reckless disregard for the truth, and after supporting those allegations with an offer of proof. *Id.* at 171, 98 S.Ct. at 2684. As we stated above, an affidavit supporting a warrant is presumptively correct; to be entitled to a *Franks* hearing, a person attacking the validity of a warrant must make a "substantial preliminary showing." *United*

*States v. McDonald,* 723 F.2d 1288, 1292 (7th Cir.1983), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984), *quoting Franks,* 438 U.S. at 155, 98 S.Ct. at 2676.

National–Standard has not even attempted to make the requisite showing. It has neither identified any false statements made by Witt nor presented any evidence proving their falsity. National–Standard has not yet shown any entitlement to a *Franks* hearing.

National–Standard contends, however, that it retains the right to engage in discovery. It argues that Rule 57 of the Federal Rules of Civil Procedure preserves the right to discovery in an action for declaratory judgment. EPA does not dispute that a party in a declaratory judgment action retains the same rights to discovery as in a "normal" civil action. EPA contends, however, that no party challenging the veracity of an affidavit supporting an administrative search warrant is entitled to discovery; hence, EPA concludes, no such party pursuing a declaratory judgment action is entitled to discovery either. While we offer no opinion on whether *no* party challenging the veracity of an affidavit supporting an administrative search warrant is entitled to discovery, we agree with EPA that National–Standard in this case is not entitled to discovery.

In *Gilbert & Bennett,* the company argued on appeal that the district judge had abused his discretion and denied the company due process of law by not granting it discovery prior to denying its motion to quash the administrative warrant. The court of appeals rejected this argument:

> Discovery decisions are committed to the sound discretion of the district judge, and they may not be easily reversed on appeal. In the instant case the warrant application, which referred to an "employee complaint," incorporated the sworn affidavit of an OSHA compliance officer. The district judge could correctly assume, therefore, that the information contained therein was true and correct. Because this information was adequate on its face to establish probable

cause there was no need to pursue further discovery, and the judge acted properly in not granting such relief.

589 F.2d at 1340.

In the present case, to prevail on the merits, National–Standard must demonstrate deliberate falsity in Witt's affidavit. We think it extremely unlikely National–Standard could succeed. The affidavit indicated why Witt believed releases had occurred and why she believed the releases were of hazardous wastes. Accompanying the affidavit were photographs of what appear to be chemical spills, polluted water, leaking barrels, dead vegetation, and so on. As long as these photographs were taken at National–Standard's facilities, EPA had probable cause to conduct a closer inspection and sampling visit. The likelihood that National–Standard could obtain evidence to the contrary is extremely remote. The cost of discovery far outweighs any potential benefits arising from discovery. Therefore, we will grant the EPA's motion barring further discovery.

■ Having now decided that the warrant was supported by probable cause, and that National–Standard is entitled to neither discovery nor a *Franks* hearing, we now must determine whether EPA violated National–Standard's rights when it sought the warrant on an *ex parte* basis and whether the magistrate erred by issuing the warrant on such a basis. There is no doubt that the Fourth Amendment does not prohibit the issuance of administrative warrants on an *ex parte* basis. *Stoddard Lumber Co., Inc. v. Marshall,* 627 F.2d 984, 989 (9th Cir.1980). Indeed most warrants, whether criminal or administrative, are issued on an *ex parte* basis. National–Standard's objection is not to EPA's general practice of obtaining administrative warrants *ex parte;* National–Standard objects to EPA's application for a warrant *ex parte* after it knew National–Standard objected to EPA's proposed sampling visit and even after National–Standard filed this lawsuit to contest the matter.

National–Standard relies exclusively on *In re Stauffer Chemical Co.,* 14 E.R.C. 1787 (D.Wyo.1980), *aff'd sub nom. Stauf-*

*fer Chemical Co. v. E.P.A.*, 647 F.2d 1075 (10th Cir.1981). In *In re Stauffer*, EPA sought access to Stauffer's plant for purposes of conducting an inspection pursuant to the Clean Air Act. EPA wanted to bring into the plant two employees of a private consulting firm who would do the actual inspection. Stauffer, voicing concerns about giving private parties access to plant areas containing confidential processes and trade secret information, insisted that the consultant's employees sign nondisclosure and hold-harmless agreements. Stauffer further reserved the right to exclude the consultant's employees from certain areas of the plant not containing emission sources. Despite ongoing negotiations between Stauffer and EPA, EPA sought and obtained in an *ex parte* proceeding an administrative warrant granting EPA and its consultants full access to Stauffer's plant.

The district court granted Stauffer's motion to quash the administrative warrant. The court found that the employees of the consultant were not "authorized representatives" of the EPA as that term is used in the Clean Air Act. The court further found that EPA's use of an *ex parte* proceeding to obtain an administrative warrant was "improper and violated principles of fundamental fairness." 14 E.R.C. at 1741. The district judge felt that denying Stauffer the opportunity to contest the issue *before* the warrant was issued violated fundamental principles of justice and fair play. *Id.*

We find *In re Stauffer* distinguishable from the case at bar and hence inapplicable. The real evil perpetrated by EPA in *In re Stauffer* was that Stauffer would be irreparably harmed once the consultant's employees entered sensitive areas of the plant. Despite this imminent and real harm to Stauffer, and despite EPA's knowledge of Stauffer's concerns, EPA proceeded *ex parte* to get a warrant. By contrast, National–Standard never tendered "trade secrets" or "confidential information" as a reason for disputing EPA's right to conduct an inspection and sampling visit. National–Standard simply disagreed with EPA's interpretation of RCRA. Na-

tional–Standard would not suffer the same kind of immediate harm as that suffered by Stauffer—no confidential information would be disclosed by virtue of EPA's sampling visit. In any event, EPA informed the magistrate of National–Standard's objections to the inspection, and if the magistrate wanted to hear National–Standard's arguments, he easily could have so requested. *In re Stauffer* condemns EPA for what that court perceived to be egregious behavior. We do not view EPA's behavior in this case as so egregious as to call for condemnation and sanctions. We think it may have been better for EPA to inform National–Standard of its intent to seek a warrant and give the company a chance to appear and object. Nevertheless, EPA's failure to do so does not constitute grounds to quash the warrant.

**B. EPA's Statutory Authority**

■ In order to carry out the broad remedial goals of RCRA, EPA enjoys wide authority to regulate the storage, transportation, and disposal of hazardous and other solid wastes. The statute explicitly gives EPA the power to inspect areas where hazardous wastes are stored and to take samples of such wastes. § 6927(a). National–Standard would interpret this section to require EPA to know that hazardous wastes are or had been stored at a particular location within a facility before it could enter that location and take samples. We reject any such interpretation which would emasculate EPA's ability to pursue the broad remedial goals of RCRA. Contrary to its argument, National–Standard's interpretation is not compelled by the plain language of the statute. The main purpose of an inspection and sampling visit is to detect the presence of hazardous wastes. If EPA could not inspect an area unless it knew hazardous wastes were stored there, EPA would be rendered effectively powerless.

Other law enforcement personnel are not burdened with the requirement National–Standard would have us impose on EPA. In the criminal law, when police obtain a warrant to enter a person's house and seize a particular weapon, the police need not be

certain that the weapon is in that house. All they need is probable cause. Even if the person who answers the door tells the police that no such weapon is to be found within, the police may enter and look for themselves. By the same token, EPA need not know that hazardous wastes were stored in a particular location to inspect that area and take samples. All EPA needs is probable cause. Moreover, EPA need not believe National–Standard when it says that hazardous wastes had never been stored at a particular location. EPA is entitled to go to see for itself. As long as EPA has probable cause to believe that hazardous wastes are or have been stored in any place, EPA may enter that place to inspect and take samples.

But EPA's sampling authority is not limited to areas where there is probable cause to believe hazardous wastes are or have been stored. EPA possesses a limited authority to take samples from areas where hazardous wastes never were stored. The power to take background samples is implicit in EPA's power to detect releases of hazardous wastes. Any valid scientific survey or experiment requires the existence of a control group, one that remained untouched by whatever the experiment was designed to test. In the pharmaceutical world, this means giving part of the study group a placebo and part of the group the drug under investigation. In the environmental world, when the quest is to determine whether man has introduced various substances into the environment, scientists need to take samples of pristine locations as a control. There is no indication in the statute that Congress intended to foreclose EPA from taking control or background samples in the ordinary course of scientific investigation.[7]

■ Finally, National–Standard argues that EPA has statutory authority to inspect and sample only areas that are SWMUs. National–Standard bases its argument on section 6924(u), the corrective action section. National–Standard then expends much energy in arguing that most of the locations from which EPA took samples are not SWMUs. We reject National–Standard's attack because of its faulty premise, that only SWMUs may be inspected and sampled.

Section 6924(u) limits EPA's authority to order corrective action to releases from SWMUs at storage facilities. If EPA were trying to order corrective action at locations which are not SWMUs, National–Standard's argument would have some force. But RCRA does not limit EPA's inspection and sampling authority to SWMUs. EPA may inspect *any* area in which hazardous wastes are or have been stored; similarly, EPA may take samples of hazardous wastes from any person. § 6927(a). There simply is no mention of SWMUs in section 6927(a) or any indication that Congress implicitly intended to limit EPA's inspection and sampling authority under RCRA to SWMUs.[8] Therefore, we reject any reading of section 6927(a) which limits EPA's inspection and sampling authority to SWMUs. We conclude that EPA acted within its statutory authority at all times.[9]

7. National–Standard contends that EPA chose as its background sampling locations areas in which pesticides and fertilizers had been applied, and an area which used to be a livestock barn. Even if true, EPA's unwise selection of background sampling points in this case does not affect its right to take background samples in general. National–Standard may contest the validity of the sampling visit in the normal course of the RCRA permitting process.

8. National–Standard argues that EPA's authority under section 6927(a) is restricted to inspections and sampling visits "[f]or the purposes of ... enforcing the provisions of this chapter." This is true, but EPA's authority in any given case is not limited to one or two sections explicitly invoked. EPA's mandate under Chapter 82 of Title 42, §§ 6901–6991, is quite broad. EPA is empowered to carry out the national policy of treating, storing, and disposing of wastes "so as to minimize the present and future threat to human health and the environment." § 6902(b). The provisions of RCRA are broad enough to authorize EPA to inspect and sample areas which are not SWMUs.

9. Because we find EPA's conduct entirely lawful, we also find the actions of its employees and consultants lawful. Neither K.W. Brown nor Harding–Lawson Associates exceeded the authority granted them by RCRA.

### V. Conclusion

The defendants obtained a valid warrant authorizing them to inspect and sample National–Standard's facilities. They did not exceed their statutory authority. We find no genuine issues of material fact and determine entry of summary judgment for defendants to be appropriate. We hereby held the defendant's conduct lawful, and enter declaratory judgment accordingly.