**NATIONAL–STANDARD COMPANY,**
**Plaintiff–Appellant,**

**v.**

**Valdas V. ADAMKUS, as Regional Administrator of the United States Environmental Protection Agency, Lee M. Thomas, as Administrator of the United States Environmental Protection Agency, Harding–Lawson Associates, and H. and K.W. Brown, Defendants–Appellees.**

**No. 88–1833.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1988.

Decided July 17, 1989.

Louis M. Rundio, Jr., Robert J. Slobig, McDermott, Will & Emery, Chicago, Ill., for plaintiff-appellant.

Anton R. Valukas, Office of U.S. Atty., Nancy K. Needles, Chief, Civ. Div., Gail C. Ginsberg, Asst. U.S. Atty., Chicago, Ill., William B. Lazarus and Robert L. Klarquist, Dept. of Justice, Lands Div., Appellate Section, Washington, D.C., James R. Arnold, Graham & James, San Francisco, Cal., for defendants-appellees.

Before COFFEY, RIPPLE, and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

This case involves Environmental Protection Agency (EPA) inspections of two facilities owned by National–Standard Company (National–Standard) in Niles, Michigan. In its original declaratory judgment action, the appellant challenged whether the Resource Conservation and Recovery Act (RCRA), as amended by the Hazardous and Solid Waste Amendments of 1984 (HSWA), 42 U.S.C. §§ 6901 *et seq.*, authorizes EPA to inspect the National–Standard facilities. The district court upheld EPA's inspection authority, and granted the agency summary judgment. It also denied National–Standard's discovery motion. We now affirm.

## I.

## BACKGROUND

National–Standard is a Delaware corporation that manufactures wire products at its Lake Street and City Complex facilities located in Niles, Michigan. National–Standard's manufacturing process generates, and the company stores, materials such as hydrochloric acid, sulfuric acid, and alkaline wastes. These by-products are within the RCRA definition of "hazardous waste." The statute defines hazardous waste as:

a solid waste, or combination of solid wastes, which because of its quantity, concentration · or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an in-

crease in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).[1] As required by section 6925(a), National–Standard applied to EPA for a permit for the treatment, storage, and disposal of the hazardous wastes it generated. *See* 40 C.F.R. § 270 [hereinafter TSD permit]. At present, its application remains pending, so that National–Standard's facilities currently are operating under "interim status." 42 U.S.C. § 6925(e)(1). Interim status facilities are required to handle hazardous wastes as if operating under a permit. *Id.* (Persons having applied for a hazardous waste disposal permit "shall be treated as having been issued such permit until such time as final administrative disposition of such application is made."). As part of the process of obtaining a permit, corrective action must be taken with regard to any releases of hazardous wastes. Interim status facilities that experience hazardous waste releases are also subject to corrective action. *Id.* at §§ 6924(u), 6928(h).

On March 24 and 25, 1987, EPA officials visited the facilities and performed visual site inspections. During that tour, the officials determined that there were several "solid waste management units" (SWMUs) at each facility and that corrective action would be necessary. On April 3, EPA formally notified National–Standard that it was planning a sampling visit at National–Standard's facilities as the next stage of the corrective action program required under sections 6924(u) and 6927. *See* Letters from Richard Traub to Richard Moessner (Apr. 3, 1987) [hereinafter Notification Letters]; Vol.I, R.1 at Ex. 1–A, 1–B. In the Notification Letters, EPA stated that it wanted to conduct a hazardous waste inspection and collect samples to determine the nature of any corrective action required at National–Standard's facilities before granting the company a permit to store hazardous wastes. The Notification Letters also stated that EPA contractors (defendants-appellees Harding–Lawson Associates and K.W. Brown & Associates, Inc.) were to assist with the sampling, and that representatives of the Michigan Department of Natural Resources would observe the inspection. Finally, the Letters identified thirty SWMUs at the Lake Street and City Complex facilities that would be targeted by the inspection team.

National–Standard refused to consent to the inspection. It protested the breadth of EPA's intended sampling, and stated that section 6924(u) did not authorize the "fishing expedition" proposed by EPA. It also alleged that many of the proposed sampling sites were not SWMUs.[2] *See* Letters

1. In the briefs, the parties consistently refer to particular provisions of RCRA, as amended. In this opinion, however, any references to statutory sections shall be to Title 42 of the United States Code. The corresponding relevant enactments are as follows:

| RCRA | U.S.C. |
|------|--------|
| § 1004(5) | 42 U.S.C. § 6903(5) |
| § 3004(u) | 42 U.S.C. § 6924(u) |
| § 3005(a) | 42 U.S.C. § 6925(a) |
| § 3007(a) | 42 U.S.C. § 6927(a) |

2. Neither RCRA nor the regulations promulgated thereunder define *"solid* waste management unit" (SWMU). The regulations do define a *"hazardous* waste management unit" as follows:

'Hazardous waste management' unit is a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area. Examples of hazardous waste management units include a surface impoundment, a waste pile, a land treatment area, a landfill cell, an incinerator, a tank and its associated piping and underlying containment system and a container storage area. A container alone does not constitute a unit; the unit includes containers and the land or pad upon which they are placed.

40 C.F.R. § 260.10.

The district court formulated its own definition of SWMU by substituting the word "solid" for "hazardous" in the above regulation. Mem. Op. at 3 n. 3. Neither party challenges this definition. The district court claimed support for this interpretation from EPA's promulgation of final regulations under the HSWA, which state:

The term 'solid waste management unit' includes any unit at the facility 'from which hazardous constituents might migrate, irrespective of whether the units were intended

from Mary Ellen Hogan to T. Leverett Nelson (May 11, 1987), Vol.I, R.1 at Ex. 2–A, 2–B; Appellant's Br. at 38–39. Soon afterwards, National–Standard filed a declaratory judgment action in the district court for the Northern District of Illinois. Vol.I, R.1. The complaint sought declaratory relief on the ground that EPA lacked authority under section 6924(u) to inspect the National–Standard facilities and that any inspections allowed under sections 6924(u) and 6927(a) were limited to hazardous wastes specifically listed in the Code of Federal Regulations. *Id.* Venue was grounded on the location in Chicago of the EPA Regional Administrator charged with overseeing RCRA enforcement at the facilities.

Three days after the filing of the complaint, EPA applied for and obtained ex parte an administrative search warrant to inspect the National–Standard facilities from the United States magistrate in the district court for the Western District of Michigan (the district that encompasses Niles). Attached to the warrant application was the affidavit of Ms. Carol Witt, an EPA geologist. Ms. Witt had been part of the EPA visual site inspection team that visited the National–Standard facilities on March 24th and 25th; as a result of this inspection, she had determined that there were several SWMUs at each facility. She further stated that, based on her observations of discolored soil, surface water body sediments, discontinuities in vegetation, and odors, there had been releases of what may be hazardous wastes or constituents from some of the SWMUs. She believed the releases may have been hazardous wastes because they were near known SWMUs containing ignitable solid wastes, copper cyanide, lead, or waste water treatment sludges from electroplating operations. Ms. Witt proposed taking no more than sixty solid waste, water, and air samples, including background samples, at the facilities. Vol.II, R.10 at Ex. B. On July 15, 1987, three days after obtaining the warrant, EPA commenced execution.

On June 16, 1987, National–Standard responded, filing in the district court for the Western District of Michigan: (1) a complaint seeking preliminary and permanent injunctive relief barring EPA from continuing the inspection and from using the inspection results; and (2) an emergency motion to quash the administrative search warrant and to transfer venue of all Michigan proceedings to the district court for the Northern District of Illinois. Vol.II, R.1 at Ex. A & Ex. B. After conferring with the district judge presiding over the pending declaratory judgment action in the Northern District of Illinois, the chief judge of the Western District of Michigan ordered all proceedings transferred to Illinois. *National–Standard Co. v. Adamkus*, No. 87–42–M (W.D.Mich. June 16, 1987) (order); Vol.II, R.1 at Ex. C.

Eventually, all matters were consolidated in the Northern District of Illinois. Upon making a finding of relatedness, the district court joined the Michigan-initiated proceedings with the original declaratory judgment action. The court also entered an agreed order whereby EPA could continue its inspection and take samples from the National–Standard facilities, but could not obtain the results of the analyses from EPA's contract laboratories. National–Standard then filed an amended complaint seeking declaratory relief, an order quashing the administrative search warrant, and preliminary and permanent injunctive relief as to the results of the first inspection. Vol.II, R.30. This complaint, when read in its totality, requests a broad adjudication as to the inspection powers of EPA with respect to a facility such as National–Standard's.

The district court later granted EPA's motion to deny National–Standard's discovery requests and granted summary judgment in favor of EPA and its contractor codefendants. *National–Standard Co.*

for the management of solid and/or hazardous wastes.' H.R.Rep. No. 198, 98th Cong., 1st Sess., Part 1, 60 (1983) ... EPA believes that the term 'unit' at least encompasses ... 'containers, tanks, surface impoundment, waste piles, land treatment units, landfills, incinerators, and underground injection wells.' 47 F.R. 32281 (July 26, 1982).

50 Fed.Reg. 28,712 (July 15, 1985); Mem. op. at 3 n. 3.

*v. Adamkus*, 685 F.Supp. 1040 (N.D.Ill. 1988) (memorandum opinion and order) [hereinafter Mem. op.]. The court also vacated the agreed order—releasing the sampling results to EPA. However, on the basis of the record before us, it appears that no EPA corrective action has been ordered since it received the sampling results.

## II.

### THRESHOLD ISSUES

#### A. *Jurisdiction*

■ Halfway through its oral argument before this court, EPA questioned, for the first time, whether the transfer order by the district court for the Western District of Michigan was properly granted. Specifically, EPA argued that Federal Rule of Criminal Procedure 41(a), in conjunction with the civil action transfer statute, 28 U.S.C. § 1404(a), requires this court to conclude that the transfer was incorrect and that, consequently, we cannot consider the propriety of the warrant's issuance. Supplemental briefs were submitted by both EPA and National–Standard. We hold that EPA has waived this issue. A thorough review of the record reveals no attempt by EPA or its coappellees to object to the transfer when it was made. Never once in all its pleadings or briefs before the various courts in this case did EPA ever question the validity of the transfer from Michigan to Illinois. The EPA did not seek review[3] of the transfer order in the Sixth Circuit. *See Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1187–88 (7th Cir.), *cert. dismissed*, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971); *Purex Corp. v. St. Louis Nat'l Stockyards Co.*, 374 F.2d 998, 1000 (7th Cir.), *cert.*

3. When, as here, the legal authority of the district court to transfer a case is at issue, mandamus has been considered an appropriate remedy. *See Van Dusen v. Barrack*, 376 U.S. 612, 615 n. 3, 84 S.Ct. 805, 809 n. 3, 11 L.Ed.2d 945 (1964); *see also Chesapeake & O.R. Co. v. Parsons*, 307 F.2d 924 (7th Cir.) *reversed on other grounds*, 375 U.S. 71, 84 S.Ct. 185, 11 L.Ed.2d 137 (1963); *Chicago, R.I. & P.R. Co. v. Igoe*, 212 F.2d 378 (7th Cir.1954); *Dairy Indus. Supply Ass'n v. La Buy*, 207 F.2d 554 (7th Cir.1953); 15

*denied*, 389 U.S. 824, 88 S.Ct. 59, 19 L.Ed.2d 77 (1967); *see also Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 985–87 (11th Cir.1982). Nor did it move for retransfer of the matter in the district court for the Northern District of Illinois. *See Purex*, 374 F.2d at 1000; *Linnell v. Sloan*, 636 F.2d 65, 67 (4th Cir.1980); *see generally* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3846 at 359–60 (1986) ("The transfer order is not subject to review by the transferee court or its court of appeals.... But an order of transfer is not res judicata. A motion to retransfer the action may be made in the transferee court and the ruling on that motion is reviewable in the court of appeals to which the transferee court is responsible.") (footnotes omitted). Consequently, we shall not allow this afterthought to be argued before us now.

#### B. *Mootness*

■ Next, EPA submits that National–Standard's entire appeal is now moot in light of EPA's having obtained the results of the sampling analyses after the district court's agreed order was vacated. A moot case is one that fails to present a "live" controversy to the adjudicating court. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). With regard to establishing mootness, a "heavy" burden of proof rests on the party suggesting mootness—EPA. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953). EPA has failed to carry its burden.

C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3855 at 475 (1986). On the other hand, as Judge Wisdom noted for the Eleventh Circuit in *Roofing & Sheet Metal Servs. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 987 (11th Cir.1982), "there is substantial disagreement among the circuits, and some apparent confusion within the respective circuits, concerning the appropriate role of mandamus as a remedy for abuses of discretion by district courts in deciding motions under § 1404(a)."

As noted above, this appeal is from a district court judgment denying National–Standard's broad request for declaratory and injunctive relief. Due to the vacation of the agreed order, EPA now possesses the results of the search and may order corrective action at the National–Standard facilities. The facts of this case thus closely resemble those addressed by this court in *Donovan v. Fall River Foundry Co.*, 712 F.2d 1103 (7th Cir.1983). In *Fall River*, an employer appealed a district court's holding that an administrative search warrant obtained by the Occupational Safety and Health Administration (OSHA) was not violative of the employer's fourth amendment rights by reason of alleged overbreadth. Although the warrant had been executed, this court reviewed its scope and the subsequent search of the employer's records. In addressing the agency's claim that mootness precluded such review, the court said:

> Initially, it is important to note that, despite the limited search of the Fall River facility OSHA conducted in late 1982 or early 1983, this case is not moot.... [S]hould citations issue against Fall River, pursuant to the limited search, Fall River might contest them on the theory that they resulted from a search that violated the Fourth Amendment because of the overbreadth of the warrant.

712 F.2d at 1111. *Accord Matter of Kulp Foundry, Inc.*, 691 F.2d 1125, 1129 (3d Cir.1982) (case moot *because* modified warrant had been fully executed and no citations issued). *Contra B & B Chemical Co., Inc. v. United States EPA*, 806 F.2d 987, 990–91 (11th Cir.1986) (rejecting Third and Seventh Circuits' approach). Indeed, this case presents a stronger case against mootness than *Fall River*. Under the statutory scheme at issue here, there is every probability that EPA will act on the results of the samples obtained by the administrative search warrant. Under the comprehensive scheme of RCRA, discussed further *infra*, interim status hazardous waste facilities like those at National–Standard's Niles plants are subject to the same level of stringent regulation as permitted haz-

ardous waste facilities. *See generally* 42 U.S.C. § 6925(i); D. Stever, Law of Chemical Regulation and Hazardous Waste §§ 5.06[2][c], 5.06[2][d][i][B] (1988). Therefore, as a result of this search, EPA will take one of the following steps: (1) order immediate corrective action under section 6928(h); (2) consider the results and nevertheless grant a TSD permit; or (3) consider the results but not order immediate corrective action, and then later deny a TSD permit and order corrective action.

This court's holding in *United States v. Kis*, 658 F.2d 526 (7th Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982), on which EPA relies heavily, is not to the contrary. In *Kis*, we held that taxpayers' compliance with an Internal Revenue Service request for handwriting exemplars mooted their appeal as to the enforceability of government summonses for those exemplars. 658 F.2d at 532–33. In so ruling, this court agreed with earlier rulings of six other circuits on the precise question. *Id.* at 532. We said that:

> The [taxpayers] contend that this court could grant them relief by declaring the summons to be invalid and by suppressing the handwriting exemplars and any evidence obtained as a result of their submission. Such a ruling, however, would ignore the well-established rule that questions of suppression should not be considered until the time when the Government seeks to use the evidence. *It would be highly speculative so to rule at this stage, for there is no guarantee that the Government will ever seek to use that evidence.* It may never even bring any subsequent actions against the [taxpayers].

*Id.* at 533 (footnote omitted) (emphasis supplied). There is no necessity for such speculation here. The statutory scheme makes further EPA action virtually inevitable. In the legislative history of the 1984 Hazardous and Solid Waste Amendments to RCRA, Pub.L. 98–616, 98 Stat. 3221 (1984), Congress made clear that past inadequate efforts by EPA in promulgating regulations, permitting facilities, and law enforce-

ment necessitated the tightened statutes. *See* H.Rep. No. 98–198, Part I, 18–20, 44–46, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576–79, 5603–05. Congress has required EPA to take affirmative action in overseeing hazardous waste at interim status facilities.[4] Thus, to fulfill its congressional mandate, EPA *must* "use the evidence" (i.e. review the sampling analyses from this search) either to issue a TSD permit or to order corrective action.

Besides this initial use of the sampling results, it is virtually certain that EPA will likely again have to reinspect and resample the National–Standard facilities in order to guarantee the company's compliance. Congress requires those facilities granted a TSD permit to undergo mandatory inspections at least once every two years. 42 U.S.C. § 6927(e)(1). The situation presented here is thus "capable of repetition, yet evading review." *See Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). There is, given the statutory scheme, "a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1184, 71 L.Ed.2d 353 (1982) (per curiam); *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (question of constitutionality of pretrial restrictive order not

moot even after the expiration of that order upon jury impaneling); *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). EPA's initial search is the starting point of an ongoing regulatory relationship between National–Standard and EPA to ensure the safe storage and eventual disposal of hazardous wastes at the Lake Street and City Complex facilities. Under that scheme, inspections are not merely possible, but highly likely.

## III.

## WARRANT ANALYSIS

### A. EPA's Statutory Authority

■ The primary issue raised by the appellant before this court is whether RCRA authorizes EPA to inspect the National–Standard facilities. National–Standard submits that sections 6924(u) and 6927(a) bar these EPA inspections. EPA responds that RCRA clearly authorizes inspection searches like the ones conducted here, and alternatively submits that EPA's interpretation[5] of section 6927 is reasonable and thus merits deference by this court.[6] EPA also submits that section 6924(u)[7] authorizes the inspection of National–Standard's Niles facilities. We hold that the RCRA inspection provision relied upon by the magistrate—section 6927(a)—authorizes EPA's entry and inspection of National–

---

4. 42 U.S.C. § 6927(e). The HSWA also ordered EPA to promulgate regulations establishing inspection frequency. Pub.L. 98–616 at § 231. *See generally* D. Stever, *supra,* at § 5.09[2][a][iv] & n. 669.

5. *See* "Inspection Authority Under Section 3007 of RCRA," EPA Memorandum from Francis S. Blake to J. Winston Porter (Apr. 17, 1986); R.44 at Ex. A.

6. EPA Br. at 35. EPA cites *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984) (stating that "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding"). In *Chevron,* the Court determined that Congress had not spoken to the issue in question and that EPA regulations creating the

"bubble" concept were reasonable interpretations of the Clean Air Act.

7. Section 6924(u) states:
   (u) Continuing Releases at Permitted Facilities.—Standards promulgated under this section shall require, and a permit issued after November 8, 1984, by the Administrator or a State shall require, corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit under this subchapter, regardless of the time at which waste was placed in such unit. Permits issued under section 6925 of this title shall contain schedules of compliance for such corrective action (where such corrective action cannot be completed prior to issuance of the permit) and assurances of financial responsibility for completing such corrective action.
   42 U.S.C. § 6924(u).

Standard's facilities, and thus we affirm the judgment of the district court.[8]

The starting point of statutory interpretation is the now-familiar two-part test delineated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). There, a unanimous Supreme Court explained how a court is to evaluate an agency's interpretation of a statute it administers. First, the court must determine "whether Congress has spoken directly to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. at 2781 (footnote omitted). *See also American Mining Congress v. United States EPA,* 824 F.2d 1177, 1182 (D.C.Cir.1987) ("This inquiry focuses first on the language and structure of the statute itself. If the answer is not yielded by the statute, then the court is to look to secondary indicia of intent, such as the measure's legislative history."). Second, in cases where Congress' intent is not clear or where "Congress has not directly addressed the precise question at issue . . .[,] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnotes omitted). We turn, then, to the first step and examine the language employed by Congress. *See CBS, Inc. v. FCC,* 453 U.S. 367, 377, 101 S.Ct. 2813, 2820, 69 L.Ed.2d 706 (1981); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979).

Section 6927(a) provides:

(a) Access entry

For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes. For the purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, such officers, employees or representatives are authorized—

(1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

(2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge.

42 U.S.C. § 6927(a).

National–Standard submits that the plain language of this provision explicitly limits any authorized inspections solely to "in-

---

**8.** National–Standard submits that EPA's reference to section 6924(u) in the Notification Letters prevents it from inspecting and sampling at locations *other than* SWMUs because that section addresses solely EPA authority to order corrective action for releases from SWMUs. We agree with the district court, however, that this argument is based on a "faulty premise."

Mem. op. at 24. EPA's invocation of section 6924(u) in the Notification Letters does not limit its authority to inspect and sample under section 6927(a), discussed *infra.* Under that provision, EPA's inspection authority is not restricted to SWMUs, but rather, it may inspect any area in which hazardous wastes are or have been stored.

spect and obtain samples from any person of any such *wastes* and samples of any *containers or labeling* for such wastes." EPA thus exceeded its authority in broadening its search to the collection of samples that, according to National–Standard, "relate to" hazardous wastes. Appellant's Br. at 16. In National–Standard's view, section 6927(a) permits EPA inspections only when a given facility identifies itself as possessing hazardous wastes, at which point EPA may sample from any SWMU those wastes, or their containers, or container labels only. Furthermore, those hazardous wastes which may be sampled are to be defined by the hazardous waste facility, not EPA. *Id.* at 17.[9]

We cannot accept such an interpretation of section 6927(a). We agree with the district court that this interpretation would "emasculate EPA's ability to pursue the broad remedial goals of RCRA." Mem. op. at 22. Like the district court, we believe that "[t]he main purpose of an inspection and sampling visit is to detect the presence of hazardous wastes. If EPA could not inspect an area unless it knew hazardous wastes were stored there, EPA would be rendered effectively powerless." *Id.* EPA's broad inspection authority is tempered by its need to show probable cause and obtain an administrative search warrant, discussed *infra*, when a hazardous waste facility owner, such as National–Standard, does not consent to the inspection.

Section 6927(a) inspections are authorized "[f]or the purposes ... of enforcing the provisions of this chapter." Chapter 82 of Title 42 of the United States Code, 42 U.S.C. §§ 6901–6991i, provides EPA with a broad mandate for enforcing the national policy of treating, storing, and disposing of hazardous wastes "so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). The Notification Letters' reference to a particular provision that authorizes *corrective action* orders for hazard-

ous waste releases from SWMUs—section 6924(u)—does *not* limit EPA's ability to *inspect and sample* from areas other than SWMUs. EPA's inspection and sampling authority derives from the broad language in section 6927(a), which empowers the agency to enforce the entire RCRA scheme, not just a particular provision. In determining the material that EPA may sample under section 6927(a), Congress significantly chose the broad, general term "hazardous waste" defined in section 6903(5) (set out in Part I) rather than "hazardous waste identified or listed under this subchapter," employed in other provisions. *See, e.g.,* 42 U.S.C. §§ 6924(a), 6925(a). This broad range of materials Congress intended to subject to sampling under section 6927(a) was demonstrated in the HSWA legislative history:

> EPA's authority under these provisions [RCRA sections 3007 and 7003] is not limited to wastes that are 'identified or listed' as hazardous, but rather includes all wastes that meet the statutory definition of hazardous wastes.

H.Rep. 198, 98th Cong., 1st Sess. 47 (1983), 1984 U.S.Code Cong. & Admin.News 5606, *see* EPA Br. at 28 n. 15.

Finally, National–Standard's interpretation of section 6927(a) as being limited to situations of proven actual releases is also incorrect. A similarly narrow interpretation of the Clean Water Act was rejected by this court in *Mobil Oil Corp. v. EPA*, 716 F.2d 1187 (7th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). In *Mobil*, this court refused to quash an administrative search warrant for the sampling of untreated waste water. The court interpreted the Clean Water Act and held that:

> These provisions of [the Clean Water Act inspection provision] leave no doubt that the Congress that enacted that Section was firmly convinced that the interest of permit holders such as Mobil in keeping secret information about the pollutants

---

**9.** National–Standard submits that: "Neither the statute nor the regulations allow U.S. EPA's subjective beliefs to be a determining factor. In fact, the person who produces the material has by regulation the responsibility for determining whether it is a hazardous waste. 40 CFR § 262.11." Appellant's Br. at 17.

in its waste water is not entitled to protection. 716 F.2d at 1190. Likewise, section 6927(a) clearly vests broad authority in EPA to inspect and sample any facility at which the agency has probable cause to believe that violations of the statute are occurring.

## B. Issuance of Warrant

National–Standard next argues that, despite EPA authority to inspect and sample pursuant to an administrative search warrant, such a warrant was granted improperly here.[10] The appellant claims three flaws in the warrant: (1) not enough probable cause was shown; (2) the warrant was overbroad; and (3) it should not have been issued ex parte. Upon review, however, we determine that none of the alleged flaws exist.

### 1. Probable Cause

■ The appellant asserts that Ms. Witt's affidavit provided insufficient probable cause for the issuance of the warrant. In order for an administrative warrant to issue, (1) there must be specific evidence of an existing violation, or (2) the search must be part of a general neutral administrative plan. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824–25, 56 L.Ed.2d 305 (1978). Here, the warrant was issued on the former basis—specific evidence of a RCRA violation. National–Standard recognizes that administrative warrants do not require the same degree of probable cause as do criminal warrants. *See Weyerhaeuser Co. v. Marshall*, 592 F.2d 373, 377 (7th Cir.1979); *In re Establishment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335 (7th Cir.1979); *West Point–Pepperell, Inc. v. Donovan*, 689 F.2d 950 (11th Cir.1982). Nevertheless, it urges that Ms. Witt's affidavit does not satisfy even these standards.

To determine whether this warrant passes probable cause muster, we shall compare the quantum of evidence presented to the reviewing magistrate to that considered by other courts reviewing the issuance of administrative search warrants. *See Gilbert & Bennett*, 589 F.2d at 1342. In *Weyerhaeuser*, this court rejected as insufficient an affidavit for an OSHA search that merely stated a generalized summary of the one complaint that the agency received. 592 F.2d at 378 & n. 6. In *Gilbert & Bennett*, this court upheld a very detailed affidavit in support of an OSHA search that listed explicit conditions and complaints. 589 F.2d at 1339–42. The court also noted that in determining whether probable cause exists, " 'the need for inspection must be weighed in terms of [the] reasonable goals of code enforcement.' " *Id.* at 1338 (quoting *Camara v. Municipal Ct.*, 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967)); *see also Burkart Randall Division of Textron, Inc. v. Marshall*, 625 F.2d 1313 (7th Cir.1980). In *West Point–Pepperell*, the Eleventh Circuit found sufficient probable cause in an affidavit based on nearly seventy interviews. 689 F.2d at 958.

■ Here, we conclude that, like the affidavit reviewed in *Gilbert & Bennett*, Ms. Witt's detailed affidavit satisfies the level of probable cause necessary for the issuance of an administrative search warrant. As outlined *supra*, Part I, the affidavit explained the various known hazardous wastes at the National–Standard facilities and the affiant's observations at earlier visual site inspections. *See* R.44 at Ex. D. Additionally, the affidavit included photographs of what appear to be dead vegetation, leaking barrels, etc. "In no way was the warrant application mere boilerplate," concluded the district court. Mem. op. at 16. We agree. This specificity, together with Congress' express desire for strong enforcement of the RCRA statute, *supra*, clearly constituted sufficient probable cause for the issuance of the administrative search warrant.

### 2. Overbroad Warrant

■ National–Standard also argues that the warrant purports to grant EPA permis-

---

**10.** Other than the jurisdictional and mootness claims discussed *supra*, EPA raises no procedural challenges to our consideration of this issue.

sion to perform inspection and sampling beyond that specifically described in RCRA. *See* 42 U.S.C. § 6927(a). In particular, it submits that "background samples" authorized by the warrant are not authorized by RCRA. Appellant's Br. at 36. National–Standard has not asserted that procurement of such background sampling incurred any specific problems, such as undue interference with plant operations; indeed, an examination of a map of the facilities confirms that no sampling locations were obstructive.

The Supreme Court's discussion in *Dow Chemical Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), is persuasive guidance. There, Dow claimed that EPA had no authority to use aerial photography to implement its statutory power for site inspection under the Clean Air Act. The Court held that:

> Congress has vested in EPA certain investigatory and enforcement authority, without spelling out precisely how this authority was to be exercised in all the myriad circumstances that might arise in monitoring matters related to clean air and water standards. *When Congress invests an agency with enforcement and investigatory authority, it is not necessary to identify explicitly each and every technique that may be used in the course of executing the statutory mission. . . .*
>
> *Regulatory or enforcement authority generally carries with it all the modes of inquiry and investigation traditionally employed or useful to execute the authority granted.*

476 U.S. at 233, 106 S.Ct. at 1824 (emphasis supplied).

Background sampling is a mode of "inquiry and investigation traditionally employed" in the type of scientific sampling authorized by section 6927(a). Accordingly, we agree with the district court that "[t]he power to take background samples is implicit in EPA's power to detect releases of hazardous wastes." Mem. op. at 23.

There is "no indication in the statute that Congress intended to foreclose EPA from taking control of background samples in the ordinary course of scientific investigation." *Id.* Therefore, in light of our determination that the administrative search warrant was properly limited in scope (location, duration, and number of samples) to meet the *Dow* standard, we hold that the warrant was not overbroad.

### 3. Ex Parte

■ To persuade this court that use of an ex parte proceeding was improper, National–Standard relies almost exclusively on the district court opinion in *In re Stauffer Chemical Co.*, 14 Env't Rep.Cas. (BNA) 1737 (D.Wyo.1980), *aff'd*, 647 F.2d 1075 (10th Cir.1981). In *Stauffer*, the district court quashed an EPA administrative search warrant for the Clean Air Act inspection of a phosphate plant. It said that:

> The use of an *ex parte* proceeding to obtain the Administrative Warrant was, *under the circumstances of this case*, improper and violated principles of fundamental fairness. This is a case of first impression. EPA's counsel ... was at all times fully aware that Stauffer would challenge the Agency's authority to force entry by private contractors onto plant premises. For that reason, fundamental principles of justice and fair play dictated that Stauffer be allowed to contest the issue before a warrant was issued and the entry effectuated. However, instead an ex parte procedure was issued by EPA in this case, without notice of any kind to Stauffer. . . . Although *ex parte* warrants may be proper under other circumstances, we feel that in view of the novel aspects of this case, notice and an opportunity to be heard should have been provided by the EPA's attorney.

*Stauffer*, 14 Env't Rep.Cas. (BNA) at 1741 (emphasis supplied).[11] National–Standard submits that, like the Stauffer Company, it voiced its intention to mount a legal challenge to EPA's authority to inspect, no

---

11. In *Stauffer*, the company had made clear that it did not contest the right of government officials to enter the premises but did contest EPA's

contracting inspection responsibilities to private contractors.

exigent circumstances existed, National–Standard had been cooperative in following the permit procedure, and these provisions of RCRA had not yet been interpreted by this court.

National–Standard's argument fails to recognize that ex parte proceedings are the normal means by which warrants are obtained in both criminal and administrative actions, and do not, in and of themselves, evidence bad faith. *See Midwest Grower's Co–Op v. Kirkemo*, 533 F.2d 455, 464 (9th Cir.1976); *In re Stanley Plating Co., Inc.*, 637 F.Supp. 71, 72 (D.Conn.1986). In *Stanley Plating*, the court held that the pendency of a civil proceeding that had been initiated against the polluter by EPA did not prevent the agency from invoking its search and sampling power accorded by section 6927(a); the discovery constraints of Rule 26 of the Federal Rules of Civil Procedure did not dictate otherwise. 637 F.Supp. at 72.[12]

EPA's inspection authority in section 6927(a), together with the admitted presence of hazardous waste at the facilities, an EPA scientist's belief that a release of hazardous waste had occurred, and satis-

factory probable cause, preclude any argument that it was improper for EPA to apply for and obtain an ex parte administrative search warrant. The mere pendency of a related civil action does not automatically preclude EPA's use of other authorized law enforcement techniques such as the ex parte application for an administrative search warrant. *See Stanley Plating*, 637 F.Supp. at 72.

## CONCLUSION

 EPA was properly authorized by section 6927(a) to perform an inspection and sampling visit at the Niles Lake Street and City Complex facilities of the National–Standard Company. Therefore, we affirm the district court's grant of summary judgment to EPA on this issue.[13] We also affirm the district court's judgment upholding the issuance of the warrant and denial of discovery to National–Standard.[14]

AFFIRMED.

---

**12.** Similarly, the Ninth Circuit in *Midwest Growers* reasoned that the Interstate Commerce Commission's use of an ex parte warrant did not demonstrate bad faith, despite the court's ruling that the agency's belief in its authority was erroneous. 533 F.2d at 464 & n. 21. As we discussed *supra*, EPA here correctly concluded that it possessed statutory authority.

**13.** As outlined by the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), summary judgment should be granted when there exists no genuine issue of material fact. Here, the appellant submits that conflicts between the affidavits of Ms. Witt and Mr. Richard Moessner, National–Standard's manager of environmental control, evidence such a genuine issue of material fact. Specifically, National–Standard argues that, although Ms. Witt attested to facts with sufficient particularity to support an administrative warrant, questions arise to the satisfaction of the level of particularity required by Rule 56(a) of the Federal Rules of Civil Procedure. Upon making a *de novo* examination of the subject matter of the summary judgment motion—the validity of the search and the warrant—however, we conclude that the appellant is mistaken. As demonstrated above, *supra* Part III.B., no genuine issues of material fact exist about the validity of the warrant.

**14.** The district court ruled that National–Standard may not pursue discovery of the warrant application and obtain a hearing to challenge the factual assertions in Ms. Witt's affidavit. Mem. op. at 17. The court stated that *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), allowed challenges of an affidavit's truthfulness only after a "substantial preliminary showing" of falsehood. *Id.*

In *In re Establishment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335 (7th Cir.1979), we held that a district judge's decision to deny discovery of the facts attested to in support of an administrative warrant was, like all discovery decisions, "committed to the sound discretion of the district judge, and ... may not be easily reversed on appeal." 589 F.2d at 1340. Where the information provided "was adequate on its face to establish probable cause[,] there was no need to pursue further discovery, and the judge acted properly in not granting such relief." *Id. Accord Donovan v. Mosher Steel Co.*, 791 F.2d 1535, 1537 (11th Cir.1986) ("the reviewing court is charged with examining the magistrate's actual probable cause determination—not what he or she might have concluded based on information not presented in the warrant application"), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 829 (1987); *cf. Brock v. Brooks Woolen Co., Inc.*, 782 F.2d 1066, 1069

(1st Cir.1986) ("*Franks* merely holds that subfacial challenges are not *mandated* to protect a defendant's constitutional rights unless the specified showing is made.") (emphasis in original).

Under the *Gilbert & Bennett* rule, we find no abuse of discretion by the district court, and thus we affirm its denial of discovery to National–Standard.