**VENCOR, INCORPORATED,**
**Plaintiff–Appellant,**

v.

**David O. WEBB, Defendant–Appellee.**

**No. 93–2792.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1993.

Decided Aug. 31, 1994.

Michael M. Conway (argued), David B. Goroff, Adam M. Kingsley, Hopkins & Sutter, Chicago, IL, for plaintiff-appellant.

John A. Simon, Asst. Atty. Gen., Thomas Campbell (argued), Michael D. Murphy, Richard Michael Duffy, Gardner, Carton & Douglas, Chicago, IL, for defendant-appellee.

Before WOOD, Jr., CUDAHY, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Vencor, Incorporated sought to enjoin a former employee, David O. Webb, who had served as an assistant administrator of finance at one of the company's hospitals, from working for one of Vencor's chief competitors, Transitional Hospital Corporation (THC). The district court denied Vencor's motion for a preliminary injunction, finding the covenant not to compete unreasonable, and therefore unenforceable. Vencor now appeals.

### I.

Vencor is a Delaware corporation with its principal place of business in Louisville, Kentucky. It owns and operates twenty-six hospitals, most of which are certified to provide long-term, acute-care to chronically ill patients. Certification is required in order for the hospitals to receive medicare reimbursements. Vencor considers itself a leader in the area of long-term, acute care, with this field comprising substantially all of its business. It was the first corporation to establish this particular type of hospital in 1986, and now it owns and operates similar facilities in twelve states, which serve patients from twenty-two different states.

The field of long-term, acute care primarily involves the provision of care to the chronically ill who require lengthy recovery periods and life support systems. Due to the varying regulations governing Medicare and insurance reimbursement for this category of patients, long-term, acute care is relatively distinct, for most hospitals are unable to provide this type of care. Vencor has three principal competitors, including THC, that

operate long-term, acute-care hospitals. Currently, THC has three hospitals that are awaiting certification, two of which are located in the same metropolitan areas as Vencor's facilities.

In May, 1990, Vencor personnel developed an Administrative Policies and Procedures Manual, at an estimated cost of one million dollars, to provide guidance in operating a long-term, acute-care hospital. The manual contains a preamble establishing the confidentiality of the manual, and its individual pages are marked "[c]onfidential and proprietary information." Although the manual was stored in the administrator's office at each hospital, there were no precisely defined policies as to where the manual was to be kept, who could review it or a specific sign-out procedure for it. Access to the manual was restricted to the members of each hospital's administrative team, departmental directors and hospital supervisors.

Vencor also created other documents to facilitate the operation of its business, such as a Full–Time Equivalent ("FTE") report, which was a more detailed and comprehensive cost report than the one Vencor was already required to send to Medicare. Other financial documents included Vencor's "cost per patient day report" and the "net revenue schedule" which charted the amount of compensation Vencor received per day for each type of patient. W. Earl Reed, the vice-president of finance and development for Vencor, testified that these documents took Vencor personnel six years to develop, that they were unique to the long-term, acute-care market and as a result he considered their contents to be confidential.

Vencor also used a "chargemaster" which contained standardized charges and terminology for the various procedures Vencor hospitals followed. Additionally, Vencor maintained a "consolidated charge history," which is a computer program developed by a contractor in conjunction with Vencor. This program charts revenues and costs per department and per procedure at all Vencor hospitals.[1]

---

1. Although evidence indicated that Webb re-

quested and received permission to obtain a con-

Webb was employed by Vencor as an assistant administrator of finance for the Sycamore, Illinois hospital. In that position, he had access to all of these financial documents and this information. Webb had used the Administrative Policies and Procedures Manual on several occasions, and was sent a draft copy of the Financial Policies and Procedures Manual for review in January 1993.

In July 1992, Webb was paid $1,000 to enter into a "Confidentiality and Non-Competition Agreement" with Vencor. The agreement provides, for the most part, that for a twelve month period after his employment at Vencor is terminated, Webb will not "engage, directly or indirectly, within the continental United States (the 'Geographical Territory') in any 'Competitive Business.'" Competitive business was initially designated in the agreement to mean "any business or activity conducted by the Company as of the date of Employee's termination from the Company, including, but not limited to, providing long-term hospital care to medically complex, chronically-ill patients." However, in a letter Webb received on July 8, 1992 from the vice-president of operations, the term "competitive business" was "clarified" to apply "*solely* [to] the provision of long-term hospital care to medically complex, chronically ill patients." [2]

The agreement prohibits an employee from divulging any of Vencor's confidential information, which it defines as "all proprietary information concerning the Company's present and proposed businesses, operating methodologies, referral sources, assets, marketing strategies, financial and clinical matters, including all procedures, systems and techniques used by the Company in evaluating its operations and the quality of its services, all financial data and pricing information relevant to the Company's operations and all business and marketing plans and financial protections." [3]

Webb ultimately resigned from Vencor and accepted a position with THC as manager of its central business services in which he supervised THC's billings and collections. Webb testified that his duties at THC included developing methodologies used to collect accounts, reviewing the computerized billing system and developing documents related to patient billing. Webb admitted that he considered the Vencor manuals and financial documents to be confidential, and that he has not taken any Vencor documents, nor disclosed any of the proprietary or confidential information.

## II.

Since oral argument, the parties have informed the court that Webb's employment with THC has been terminated. We therefore consider whether this suit (originally brought to enjoin Webb from working at THC) has become moot. Despite Webb's argument that this matter is moot, we are not convinced that the controversy here "no longer 'touch[es] the legal relations of the parties having adverse legal interests.'" *De-Funis v. Odegaard*, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974), quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

■ The general rule is that a case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980), quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). While the question whether to enjoin Webb from working at THC may now be moot, the Supreme Court has recognized an exception to the general rule in situations that are "capable of repetition, yet evading review."

solidated charge history just prior to the time he terminated his employment, there was no evidence that he actually reviewed the document.

**2.** Webb never signed or received any additional consideration in exchange for this modification of the agreement.

**3.** Vencor conceded at the hearing that it was not seeking to enforce the confidentiality section of the agreement.

■ This doctrine has been "limited to a situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). Webb describes the chances that he would go to work for one of the two remaining principal competitors of Vencor as "a mere physical or theoretical possibility." Such "a mere physical or theoretical possibility" has never been held by the Court to be sufficient to satisfy the test set forth in *Weinstein. Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). Rather, the Court requires that there must be a "reasonable expectation" or a "demonstrated probability" that the wrong will be repeated. *Id.* Webb argues that there is no support for such a "reasonable expectation" in the record, and thus the appeal is moot. We disagree.

■ A heavy burden of proof rests on the party suggesting mootness. *National–Standard Co. v. Adamkus,* 881 F.2d 352, 356 (7th Cir.1989); *see also County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Webb has failed to meet his burden. The agreement restricted Webb from working for any one of Vencor's principal competitors for twelve months. With Webb's employment at THC terminated on April 8, 1994, Vencor would, if the agreement were found to be enforceable, be entitled to the enforcement of the covenant until April 8, 1995.

Webb's last two positions of employment were in the specialized field of long-term, acute-care hospitals for the chronically ill. Webb is currently unemployed and presumably seeking employment. The only evidence offered by Webb to persuade the court that there is no "reasonable expectation" that he will work for one of Vencor's two other competitors, or even return to work at THC, is that there are a number of potential employers for someone with his experience and skill. But he has not produced any evidence about the location of Vencor's other two competitors, about whether or not he has been in touch with either of these competitors in his job search or about the nature of his future employment intentions. We are therefore not convinced that there is no "reasonable expectation" or "demonstrated probability" that Webb will not work for a Vencor competitor, which would resurrect this disputed issue. As a result, this appeal is not moot.

### III.

"We review a district court's decision to grant or deny a preliminary injunction under the abuse of discretion standard. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992). [A] court abuses its discretion when it commits a clear error of fact or an error of law." *Id.* at 13. "Absent any such error, the district court's ultimate weighing of all ... factors is entitled to great deference; while our review is more searching than an examination of whether the district court weighed those factors irrationally or fancifully, we may not substitute our judgment for that of the district court." *Id.*

■ The agreement between Webb and Vencor contained a choice of law clause, providing that the contract "shall be governed by, and shall be construed and enforced in accordance with" Kentucky law. In deciding whether the parties' choice of law provision will govern, we must apply Illinois' choice of law rules. *Sarnoff v. American Home Products Corp.,* 798 F.2d 1075, 1080 (7th Cir. 1986). "Illinois courts, which have long allowed parties to 'substitute the laws of another place or country,' will enforce the substituted law 'where it is not dangerous, inconvenient, immoral, nor contrary to the public policy' " of Illinois. *Id.* at 1081, citing *McAllister v. Smith,* 17 Ill. 328, 333 (1856).

■ Webb argues that this non-competition agreement is contrary to the fundamental public policy of the state of Illinois, and thus Illinois law must govern this dispute. We disagree. Here, both parties elected to have the agreement governed by Kentucky law, and we discern no reason why an Illinois

court would find the agreement to be contrary to Illinois public policy. This choice of law provision only matters (from Webb's perspective) if a Kentucky court would enforce the covenant not to compete and an Illinois court would not. But even if this is the case, there is a long way between, on the one hand, finding a covenant unenforceable and, on the other, declaring that its enforcement is so odious that a court will not respect the parties' election to be governed by the law of a state that would. We see no reason why an Illinois court would here upset the parties' agreement to be governed by Kentucky law. *Sarnoff,* 798 F.2d at 1081. Because the choice of law provision is not contrary to the public policy of Illinois, we agree with the district court's decision to apply Kentucky law.

## IV.

■ A party seeking a preliminary injunction bears the burden of establishing, as a threshold matter, four elements: first, that it has some likelihood of succeeding on the merits; and that it has no adequate remedy at law and will suffer irreparable harm if the injunction is denied. If these two criteria are satisfied the court must then balance the irreparable harm caused to the non-moving party if relief is granted against the irreparable harm to the moving party if relief is denied, and consider the harm caused to the public by granting or denying preliminary relief. *Abbott Laboratories,* 971 F.2d at 12–13.

■ This "sliding scale" approach followed in this circuit balances the degree of likelihood of success on the merits against irreparable harms. Thus, the more likely the moving party will succeed on the merits, the less the element of irreparable harm must weigh in its favor. Similarly, the less likely that the party seeking the preliminary relief will have success on the merits, the greater the element of irreparable harm required to weigh the balance in its favor. *Id.*

■ First we must examine whether Vencor has properly demonstrated that it has no remedy at law and that it will suffer irreparable injuries if preliminary relief is denied. To that end, the district court determined that Vencor would suffer irreparable injury, apparently relying on the fact that if Webb were not enjoined, the harm it sought to prevent—having an employee who had access to its confidential information work for a competitor—could not be undone. We agree that this would represent an "irreparable injury" as that term is commonly understood.

■ To determine whether Vencor has a likelihood of succeeding on the merits, we must determine if the covenant not to compete is enforceable. In Kentucky, ancillary covenants of this character are valid and enforceable if the terms are reasonable in light of the surrounding circumstances. *Crowell v. Woodruff,* 245 S.W.2d 447, 449 (Ky.Ct. App.1951). "[I]n Kentucky, ... an agreement in restraint of trade is reasonable if, on consideration of the subject, nature of the business, situation of the parties and circumstances of the particular case, the restriction is such only as to afford fair protection to the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted." *Hammons v. Big Sandy Claims Service, Inc.,* 567 S.W.2d 313, 315 (Ky.Ct.App.1978), citing *Ceresia v. Mitchell,* 242 S.W.2d 359 (Ky.Ct. App.1951).

■ Determining whether a covenant not to compete is enforceable centers on its reasonableness. The factors applied by Kentucky courts for determining whether a covenant is reasonable are very broad, allowing a good deal of discretion to the district court in making its analysis. Vencor contends that the district court created new factors not contained in Kentucky law in ascertaining the reasonableness of the agreement: specifically that the district court erred in considering whether Vencor's information was unique or proprietary and whether Webb's position at THC was identical to his position at Vencor.

■ But Vencor construes the Kentucky law too narrowly. Kentucky law instructs the court to analyze all the surrounding circumstances of each particular case. *Crowell v. Woodruff,* 245 S.W.2d at 449. The district

court concluded that it was unreasonable for Vencor to restrain Webb from continuing his employment with THC since Webb had not disclosed any confidential information he had received at Vencor, and moreover had no use for the information in his significantly different position with THC. The district court also found that Vencor's information was neither unique nor proprietary, but rather a compilation of information used in the general administration of hospitals.

The crux of Vencor's argument is that the long-term, acute-care industry is so distinct from the general health care market that THC would gain a crucial and unfair advantage if it had access to Vencor's "unique" information. Thus the district court considered whether the information held by Webb was unique and proprietary in order to ascertain the nature of the market as well as the likely effect of Webb's employment by a competitor. The district court likewise considered it relevant whether Webb was likely to use the Vencor information in his quite different position at THC. Finding that the Vencor information, while confidential, was not unique or proprietary, the district court reasonably concluded that in the particular circumstances of this case and, considering the different nature of Webb's work at Vencor in contrast to his work at THC, the covenant swept too broadly to be considered reasonable.

Since the fundamental issue in this case is whether it is reasonable for Vencor to enjoin Webb from continuing his employment with Vencor's competitors, the district court did not abuse its discretion in evaluating the circumstances surrounding his employment. We also believe that the district court did not err in finding that the covenant is not reasonable, and therefore unenforceable, under Kentucky law, and as a result Vencor would have little if any chance of succeeding on the merits.[4] Therefore, the district court's denial of Vencor's motion for a preliminary injunction is AFFIRMED.

MANION, Circuit Judge, dissenting.

I would prefer to dismiss this appeal because it is moot. David Webb has ceased his employment with THC, and is thus no longer in breach of the covenant not to compete. Were he to become employed again with another competitor during the duration of the non-compete clause, the validity of that clause would be ripe for review. Since the duration of the non-compete clause is tolled while Webb is in breach of that clause, as long as he is employed by a competitor this issue would not evade review. If he gets out of the business there is no need for review.

By accepting jurisdiction over this appeal and going on to the merits of the case with an analysis of Kentucky state law, we perhaps resolve any claims for future litigation under this particular covenant, including the still pending breach of contract claim. However, if we were to conclude that this appeal is moot, it is likely that the district court would dismiss the breach of contract claim against Mr. Webb as well. An appeal from such a dismissal would present the opportunity to review the identical issue now before the court.

4. Since Vencor has failed to satisfy the threshold requirement of showing a likelihood of succeeding on the merits, our inquiry need go no further. The district court found that even if Vencor had some chance of succeeding on the merits, the equities weighed against the issuance of a temporary injunction. The district court found that Webb, a husband and father of three young children, would be seriously harmed if he were enjoined from working at THC. The district court also found that the final factor in determining the issuance of a preliminary injunction, the public interest, added little to the final decision, since strong policy arguments were made by both sides.